## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

**MELISSA D. STRAW,**

    **Plaintiff,**

**vs.**                                                  **CIVIL ACTION NO. 3:20-CV-00028**

**ANDREW SAUL, COMMISSIONER OF**
**SOCIAL SECURITY,**

    **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered January 14, 2020 (ECF No. 4), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 13, 16)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for remand (ECF No. 13), **GRANT** Defendant's request to affirm the decision below (ECF No. 16); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this matter from the docket of this Court for the reasons stated *infra*.

1

**Procedural History**

The Plaintiff, Melissa D. Straw, (hereinafter referred to as "Claimant"), protectively filed her application for Title II benefits on May 9, 2016, alleging disability since March 12, 2013[1], because of systemic lupus erythematous, fibromyalgia, Sjogren's disease[2], hypertension, epicondylitis[3], sleep disorder, asthma, anxiety, depression, and chronic pain.[4] (Tr. at 62-63, 78, 191) Her claim was initially denied on August 16, 2016 (Tr. at 62-75) and again upon reconsideration on January 6, 2017 (Tr. at 77-91). Thereafter, Claimant filed a written request for hearing on February 14, 2017. (Tr. at 111-112)

An administrative hearing was held on September 17, 2018 before the Honorable Melissa Hammock, Administrative Law Judge ("ALJ"). (Tr. at 30-61) On December 4, 2018, the ALJ entered an unfavorable decision. (Tr. at 9-29) On February 5, 2019, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 171, 256-257) The ALJ's decision became the final decision of the Commissioner on December 16, 2019 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-6)

On January 13, 2020, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) The Defendant

---

[1] Although Claimant indicated in her application that she quit working because of her conditions (Tr. at 191), she also stated that she left her job at Alcon in March 2013 (Tr. at 192) because her "Coworkers lied. Couldn't get along with them. Was escorted off company property." (Tr. at 244) Claimant also provided various reasons for quitting her job at Alcon, including disliking the night shift (Tr. at 511) and caring for her ailing husband (Tr. at 510, 1006, 1065, 1068).
[2] Sjogren's disease syndrome is a disorder of your immune system identified by its two most common symptoms — dry eyes and a dry mouth. The condition often accompanies other immune system disorders, such as rheumatoid arthritis and lupus. See https://www.mayoclinic.org/diseases-conditions/sjogrens-syndrome/symptoms-causes/syc-20353216.
[3] Also better known as "tennis elbow". See https://www.mayoclinic.org/diseases-conditions/tennis-elbow/symptoms-causes/syc-20351987.
[4] In her Disability Report – Appeal, submitted on November 3, 2016 at the initial level of review, Claimant alleged that she had an irregular heart rhythm, experiencing more shortness of breath and chest pain, and that her depression and anxiety were worse. (Tr. at 221)

(hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 9, 10) Subsequently, Claimant filed a Brief in Support of Judgment on the Pleadings (ECF No. 13), in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 16). Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was 41 years old as of the alleged onset date and considered a "younger person" throughout the underlying proceedings. See 20 C.F.R. § 404.1563(c). (Tr. at 23) Claimant has a high school education and last worked as a production tech at Alcon, a contact lens manufacturer. (Tr. at 38)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not,

the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." 20 C.F.R. § 404.1520a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment.

Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in Section 404.1520a(c). Those Sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

4

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listings of Impairments in appendix 1 to this subpart.

(4) When we rate your degree of limitation in these areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 404.1520a(d)(1).

Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 404.1520a(d)(2).

Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 404.1520a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 404.1520a(e)(4).

## Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2018. (Tr. at 14, Finding No. 1) Next, the ALJ determined that Claimant had not engaged in substantial gainful activity since the alleged onset date of March 12, 2013. (Id., Finding No. 2)

At the second inquiry, the ALJ found that Claimant had the following severe impairments: systemic lupus erythematosus; Sjogren's syndrome; fibromyalgia; degenerative disc disease of the lumbar spine; osteoarthritis; asthma; morbid obesity; depressive disorder; and anxiety disorder. (Tr. at 15, Finding No. 3)

At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 16, Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform light work

> except the claimant can frequently balance and stoop; occasionally kneel, crouch, crawl, and climb ramps or stairs; and never climb ladders, ropes, or scaffolds. The claimant must avoid concentrated exposure to temperature extremes, vibration, pulmonary irritants, and hazards. She can perform simple, routine tasks but not at a production rate pace, with no more than occasional change in the work setting.

(Tr. at 18, Finding No. 5)

At step four, the ALJ found Claimant was not capable of performing her past relevant work. (Tr. at 22, Finding No. 6) In addition to the immateriality of the transferability of job skills, Claimant's age, education, work experience and RFC, the ALJ determined that there were other jobs that existed in significant numbers in the national economy that Claimant could perform. (Tr. at 23, Finding Nos. 7-10) Finally, the ALJ determined Claimant had not been under a disability from March 12, 2013 through the date of the decision. (Tr. at 24, Finding No. 11)

**Claimant's Challenges to the Commissioner's Decision**

In support of her appeal, Claimant asserts several grounds of error.

With regard to her mental impairments, Claimant argues that the ALJ did not give proper consideration to the opinion provided by Mary Chaney, a psychological examining consultant, particularly with respect to her "poor" prognosis. (ECF No. 13 at 5) Claimant herself testified that she had memory and concentration problems due to her mental impairments, however, the resulting RFC assessment is deficient insofar as the ALJ failed to account for these impairments. (Id.) With regard to her physical impairments, Claimant contends that the light RFC assessment is incompatible with the overall record. (Id.) She further alleges without substantial justification, the ALJ deemed several impairments non-severe, including hypertension, coronary artery disease, edema, sleep disorder/sleep apnea, irritable bowel syndrome, and epicondylitis. (Id. at 6) In short, the ALJ did not consider the combined impact of all Claimant's impairments, rendering a flawed RFC assessment. (Id.)

Next, Claimant disputes the ALJ's reconciliation of her subjective symptoms, as they support a finding of disability. (Id.) Finally, Claimant argues that the ALJ should have accepted

the vocational expert's testimony that Claimant was unable to work if she was off-task 15-20% or more each workday because of her pain and fatigue. (Id.)

Claimant requests this Court to reverse and order a reward for benefits, or alternatively, to remand to correct these errors. (Id. at 7)

In response, the Commissioner states that the RFC assessment accurately reflected both Claimant's exertional and non-exertional impairments and is supported by substantial evidence. (ECF No. 16 at 12) Further, the ALJ properly evaluated the Ms. Chaney's opinion, as she was a one-time examiner, and the ALJ compared her opinion with the balance of the record, including the opinions provided by the State agency consultants. (Id. at 12-14) The ALJ's RFC assessment also accounted for Claimant's physical impairments, severe and non-severe alike, and explained the restrictions to light work by referring to specific medical records; Claimant consistently reported no functional limitations due to fatigue and treatment records indicated no greater functional limitations than those noted in the RFC. (Id. at 14-16)

With respect to Claimant's subjective complaints, the ALJ appropriately determined that they were inconsistent with the objective medical evidence, including Claimant's own application statements. (Id. at 16-19) The ALJ did not ignore Claimant's allegations of pain and fatigue, thereby reducing her to light work and finding she was incapable of returning to her prior, medium-level work. (Id.) The ALJ's thorough explanation for her findings concerning Claimant's subjective complaints complied with the Regulations and should not be disturbed. (Id.)

Finally, the ALJ had no duty to adopt the vocational expert's opinion that was based on limitations that were not supported by the record evidence. (Id. at 19-20) In sum, the Commissioner contends that the final decision is supported by substantial evidence and asks this Court to affirm.

(Id. at 20)

**The Relevant Evidence of Record**[5]

The undersigned has considered all evidence of record pertaining to Claimant's arguments and discusses it below.

Treatment for Severe Physical Impairments:

Claimant treated with Howard L. Feinberg, D.O., at Ashland Arthritis for lupus, fibromyalgia, Sjogren's syndrome, and chronic pain. She was diagnosed with lupus in 1994 and exhibited trigger point tenderness consistent with fibromyalgia as early as 2010 (Tr. at 767-768). By June 2013, Claimant told Dr. Feinberg that she felt like her lupus was in remission—she had no active synovitis, effusion, warmth, or erythema and no pain upon range of motion, and stable range of motion in her joints (Tr. 391, 398). In December 2013, Claimant told her primary care physician David L. Patick, M.D., that she quit her job in March and still unemployed, but is a caretaker for her husband (Tr. at 510). She declined a referral to St. Mary's Pain Center for more intensive treatment and simply needed refills for maintenance medications. (Id.)

In 2014, Claimant told Dr. Feinberg that she was "feeling good and having no problems", (Tr. at 366). She reported sleeping well and walking for exercise (Tr. at 365). She was doing well physically but felt fatigued from having to stay up with her husband at night and was experiencing increased stress, anxiety, and depression due to her husband's bone cancer (Tr. at 335, 357). Moreover, although she experienced continued fatigue, throughout 2014, Claimant told Dr. Feinberg that she had no functional problems or restrictions, could perform her activities of daily living, and she needed no additional treatment (Tr. 322, 328). Her cervical and lumbar spine

---

[5] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

exhibited a stable functional range of motion with no new deformity, and her shoulders, wrists, hips, and gait were stable (Id.).

Throughout 2015, Claimant complained of fatigue but admitted the fatigue did not limit her activity levels and that she had no functional problems or restrictions (Tr. 297, 309, 315). At every visit with Dr. Feinberg, her cervical and lumbar spine exhibited a stable functional range of motion with no new deformity, and her shoulders, wrists, hips, and gait were stable (Tr. 297, 303, 309-10, 316).

Similarly, throughout 2016, although Claimant told her doctors she had some fatigue and pain, she reiterated that she had no functional problems or restrictions and did not require additional treatment (Tr. at 277, 290, 621, 927, 929). She was able to perform all her activities of daily living and was exercising on occasion (Tr. at 929, 959, 962). At every visit with Dr. Feinberg, her cervical and lumbar spine exhibited a stable functional range of motion with no new deformity, and her shoulders, wrists, hips, and gait were stable (Tr. at 277-278, 284, 290-291, 615-616, 622, 927-928, 929-930). She had full strength and power in all her extremities, no proximal muscle weakness, her sensation was intact, her coordination was normal, and her gait was normal (Tr. at 963).

In 2017, Claimant continued to do well and remained able to perform all of her activities of daily living without assistance (Tr. at 949, 952, 959, 1092). She exhibited full power in all of her extremities, no proximal muscle weakness, her sensation was intact, her coordination was normal, and she walked with a normal gait (Tr. at 949, 953, 956, 959, 1081, 1087). She had normal range of motion in her hands, wrists, shoulders, neck, hips, knees, and ankles, and no tenderness in her spine (Tr. at 950, 953, 956, 959-960). She visited St. Mary's Pain Center in August 2017

complaining of pain, but she had no weakness, no muscle spasms, no joint pain, no joint swelling, and no neurological symptoms (Tr. at 1077, 1080-1081, 1086).

By 2018, Claimant reported that she was "feeling better able to function" and had lost weight (Tr. at 940, 944). She was still able to perform all of her activities of daily living, and her power was full in all extremities, her coordination and gait were normal, and she exhibited a normal range of motion in her hands, wrists, elbows, shoulders, neck, hips, knees, and ankle (Tr. at 942, 945, 1470). Her gait, stance, and balance were all normal (Tr. at 1023, 1030, 1471).

Treatment for Non-Severe Physical Impairments:

Claimant saw Dr. Patick for her other ailments, including hypertension, coronary artery disease, edema, sleep disorder, irritable bowel syndrome, and epicondylitis.

Claimant testified that her hypertension was controlled, and Dr. Patick characterized her hypertension as benign (Tr. at 498, 501, 504, 507, 508, 511, 512, 514, 516, 520, 523, 571, 574, 577, 580, 584, 587, 589, 593, 596, 601, 603, 606, 611). Her blood pressure was in the normal range at every visit (Tr. at 498, 501, 504, 507, 511, 514, 517, 520, 523, 571, 574, 577, 580, 584, 587, 593, 596, 601, 603, 606, 611).

Claimant underwent a cardiac stress test in May 2015, which was normal (Tr. at 548). She had atypical chest pain in June 2016, but her cardiac workup showed no abnormal results (Tr. at 852, 1065), and the emergency room physician noted, "I do not feel this is related to a cardiac or a pulmonary etiology. Chest x-ray is within normal limits. Blood pressure is normal." (Tr. at 866) She complained again of chest pain in July 2018, and her results showed moderate nonobstructive coronary artery disease (Tr. at 1100-1101).

Although Claimant exhibited some trace lower extremity edema, it quickly resolved, there

11

was no claudication, and her distal pulses were intact (Tr. at 852, 856 (no peripheral edema), 991 (no orthopnea/pnd/edema), 993 (no edema in bilateral lower extremities), 995 (no edema), 1000 (no orthopnea/pnd/edema), 1002 (no edema in bilateral lower extremities), 1023 (edema not present), 1030 (edema not present), 1047, 1081 (no edema), 1086 (no edema), 1106 (no orthopnea/pnd/edema), 1108 (no edema in bilateral lower extremities), 1116 (no peripheral edema)).

Although Claimant complained of a sleep disorder, two sleep studies showed minimal evidence of a breathing-related sleep problem (Tr. at 271-272, 466-467, 810-811, 1127). In June 2012, a sleep study was negative for any obstructive sleep apnea and noted that Claimant did "not appear to have sleep-disordered breathing" (Tr. at 272, 467, 811). In August 2017, Claimant underwent another sleep study, which concluded that "treatment for sleep disordered respiration or periodic limb movement does not appear warranted based on the results of this overnight study" (Tr. at 1127). According to Dr. Patick, Claimant's irritable bowel syndrome ("IBS") was stable and "not an issue" (Tr. at 502, 575, 881, 884, 1065, 1068, 1074). Her IBS resulted in constipation, for which she took appropriate laxatives and medications (Tr. 881, 1006, 1007, 1074).

Finally, although Claimant had a history of medial epicondylitis in 2012 that preceded the alleged onset date (Tr. at 425, 757), she received no treatment beyond a band and gel, and subsequent records showed that Claimant exhibited a stable and normal range of motion in her elbow without synovitis, effusion, warmth, or erythema (Tr. at 278, 284, 290, 297, 303, 309, 316, 322, 328, 616, 622, 629, 634-635, 641, 647, 653, 659, 927, 929, 933, 942, 946, 950, 953, 956, 959, 963, 965, 967, 969, 971, 974, 976, 978, 1470, 1487).

Mental Health Treatment Evidence:

Claimant did not treat with any mental health providers during the relevant period for her anxiety and depression. In 2016, she told Dr. Feinberg that her depression was better but still present (Tr. at 277, 933, 969), and  Dr. Patick noted that Claimant was "doing well" on Effexor for her depression (Tr. at 499, 572). Claimant also told her new rheumatologist in 2016 that her depression was "improved" but still present (Tr. at 927, 929, 964, 967).

Medical Opinion Evidence:

Given the lack of mental health treatment in the record, Claimant underwent a mental status examination with no testing with licensed psychologist Mary Chaney on August 2, 2016. (Tr. at 917-922). Claimant told Ms. Chaney that she was applying for benefits due to back pain and that she had been diagnosed with lupus and fibromyalgia (Tr. at 917). Ms. Chaney noted that Claimant performed activities of daily living and self-care tasks independently (Tr. at 919). Claimant did some cleaning and drove at times, but no cooking because she cannot stand and does not shop for herself (Id.).

Upon examination, Claimant exhibited average grooming and hygiene, and her gait was within normal limits (Tr. at 920). Although Claimant appeared irritable and guarded, she was cooperative during the evaluation (Id.). She interacted in a mostly appropriate fashion, although her eye contact was poor and her verbal responses were sparse (Id.). Although her mood was extremely depressed and her affect was restricted, Claimant's thought process and content were both normal (Id.). Her immediate, recent, and remote memory were all within normal limits and intact (Id.). It was difficult to get Claimant to respond to questions (Id.). Ms. Chaney explained that her diagnosis of major depressive disorder, severe with anxious distress, was based on Claimant's reported symptoms, history, and presentation (Id.). Ms. Chaney found Claimant's

13

prognosis to be poor at the time but opined that she could manage her finances (Id.).

On June 22, 2016, Rabah Boukhemis, M.D., a State agency physician, carefully reviewed the record evidence and found Claimant capable of performing light work with additional postural and environmental limitations (Tr. at 70-71). On January 6, 2017, Narendra Parikshak, M.D., independently reviewed the record and concurred that Claimant could perform light work with additional postural and environmental limitations (Tr. at 86-88).

Two expert State agency psychiatrists also reviewed the record and found that Claimant could perform short, routine tasks (Tr. at 72-73, 88-89). On August 16, 2016, John Todd, Ph.D., determined that based on the record and Ms. Chaney's evaluation, Claimant had mild restrictions in activities of daily living and social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation (Tr. at 68). On January 5, 2017, Jeff Harlow, Ph.D., independently reviewed the record and affirmed Dr. Todd's findings (Tr. at 84, 88-89).

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that she lived with her husband, her son and his girlfriend and her two grandchildren. (Tr. at 36-37) Neither her son nor his girlfriend work, and the entire family supports itself on her husband's disability benefits. (Tr. at 37) Her husband is on disability because of cancer; Claimant helps him with some of his daily activities, such as getting him a drink. (Tr. at 36)

Claimant stated that she can drive and drove halfway to the hearing, her mother drove the other half because Claimant has bad anxiety. (Tr. at 37-38)

14

Claimant testified that her lupus was not as bad while she was working at Alcon, but it got progressively worse. (Tr. at 41-42) She takes medication for lupus – an infusion monthly and pills daily. (Tr. at 42) She confirmed that she was diagnosed with fibromyalgia, Sjogren's disease, and epicondylitis. (Tr. at 42-43) She indicated that she experiences numbness in her arms and right leg if she sits too long. (Tr. at 43) She stated that her back injury caused her right leg numbness and that half of her right foot stays numb. (Id.) She had surgery on her back, and at the time, it was considered successful, but she continues to have low back pain. (Tr. at 43-44) She has constant pain in her hip, but also has pain in her arms, shoulders, and head. (Tr. at 47) Her pain ranges from three to ten, depending on what she does. (Id.)

Claimant testified that her blood pressure is controlled "somewhat" with medication. (Tr. at 44) She indicated that her fibromyalgia interferes with her sleeping where she has "to flip and flip and flip during the night." (Id.) She has asthma for which she uses an inhaler; she also experiences heart palpitations and has daily chest pain that she attributes to lupus and fibromyalgia. (Tr. at 45)

Claimant testified that her "bowels don't work" and she takes medication that makes her "go." (Tr. at 45-46) She affirmed she has swelling in her ankles and feet. (Tr. at 46) She testified she has difficulty with memory, concentration, and handling stress. (Id.) Because of her anxiety, she mostly stays at home and keeps to herself. (Id.) She also has depression and feels fatigued all the time. (Tr. at 56) She stated she had some counseling in the past, which helped "some." (Tr. at 57)

Regarding side effects from her medications, Claimant indicated that when she takes "extra" anxiety medication, it "messes" with her "mental thinking." (Tr. at 48) Her pain medication

causes drowsiness. (<u>Id</u>.) When she has good days, she will walk around in the yard or visit with people; on a bad day she will lie in bed all day. (Tr. at 48-49) She stated that she had more good days than bad in the last thirty days. (Tr. at 49) Claimant testified that she does not have restful sleep and will rest or lie down during the day, though it depends because no day is the same; when she does nap, she will nap for at least two hours. (Tr. at 48-51) She has difficulty showering and with personal care because she is "so stiff." (Tr. at 51) She estimated she could walk half a block, but her hip pain will slow her down and her right knee "tends to lock up for no apparent reason." (Tr. at 51-52) She testified she cannot stand too long because her right foot will get numb, and will begin to tingle, burn and hurt, plus her back hurts. (Tr. at 52)

As far as lifting goes, Claimant stated she does not bring in groceries or pick up her grandchildren and she does not do many house chores, because her son and his girlfriend do those things. (Tr. at 52-53) The girlfriend does all the cooking, but Claimant will take her dirty dishes to the sink. (Tr. at 54)

As far as hobbies, Claimant watches Netflix, but used to enjoy riding four wheelers and walking on trails. (<u>Id</u>.) She does not go to church, restaurants or movies, as "getting there is a chore" since they live about an hour's drive away. (Tr. at 55)

Claimant stated that she can't get in the sun because if she gets too much sun, she feels as if she's "burning from the inside out." (<u>Id</u>.)

Claimant testified that she cannot stand or walk six hours out of an eight-hour day because she can't sit all day and "physically or mentally . . . just can't." (Tr. at 56-57)

<u>Vocational Expert ("VE") Testimony:</u>

In response to a hypothetical individual of the same age, education, and work experience as

Claimant who: could perform light work; could frequently balance and stoop; occasionally kneel, crouch, crawl, and climb ramps and stairs; could never climb ladders, ropes, or scaffolds; must avoid concentrated exposure to temperature extremes, vibration, pulmonary irritants, and hazards; and could perform simple, routine tasks but not at a production rate pace with no more than an occasional change in the work setting could not perform Claimant's past relevant work of warehouse worker. (Tr. at 58-59) Such an individual, however, could perform other work that exists in significant numbers in the national economy, including the representative occupations of cashier, housekeeper, and mail clerk, non-postal. (Tr. at 59) The VE further testified that a person who could be 20% off task, or absent just over once a month, would not be able to sustain work. (Tr. at 59-60)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are

rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." <u>Blalock</u>, 483 F.2d at 775.

**Analysis**

<u>Psychological Opinion Evidence and Mental RFC Assessment:</u>

Claimant complains that the ALJ "fail[ed] to give proper consideration to the opinion of Mary Chaney, Licensed Psychologist, a consulting examining source" (ECF No. 13 at 5), therefore, as a practical matter it is best to review how the SSA governs the criteria for evaluating opinion evidence prior to addressing the ALJ's mental RFC assessment; per 20 C.F.R. § 404.1527(a)(1):

> Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

The Regulations further state that "we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." <u>Id</u>. § 404.1527(b). "Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's medical opinion controlling weight . . . we consider all of the following factors in deciding the weight we give to any medical opinion." <u>Id</u>. § 404.1527(c). The Regulations govern how an ALJ must analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527(c)(2)-(6) including: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Medical opinions as they relate to a claimant's functional capabilities, therefore a "residual functional capacity . . . or the application of vocational factors" are determinations reserved solely to the Commissioner. <u>Id</u>. § 404.1527(d)(2). To that

extent, an adjudicator is not bound to "give any special significance to the source of an opinion on issues reserved to the Commissioner." Id. § 404.1527(d)(3).

While it is important to recognize that Ms. Chaney did not provide a "medical opinion" concerning what Claimant could still do despite her limitations or mental restrictions in accordance with the Regulations' definition, Claimant's focus on the ALJ's failure to acknowledge her "poor" prognosis simply does not demonstrate reversible error.

In her review of the evidence, the ALJ first determined that Claimant's mental impairments did not meet "paragraph B" criteria, finding that Claimant only had "mild" limitations in understanding, remembering or applying information; this was based on documentation that Claimant had no more than mild cognitive symptoms during rheumatology appointments (Tr. at 17, 927, 929, 933, 965, 978), Ms. Chaney's observation that Claimant had intact remote memory (Tr. at 17, 920), and Claimant's own statement that she can manage her own finances (Tr. at 17, 241). In interacting with others, the ALJ also found Claimant had a "mild" limitation, again noting that although Ms. Chaney indicated Claimant was somewhat irritable and guarded during the examination, her interactions were generally appropriate (Tr. at 17, 920) and that Claimant was generally cooperative and had a normal affect during an evaluation in August 2017 (Tr. at 17, 1081) and a normal affect during another evaluation in July 2018 (Tr. at 17, 1108). With regard to concentrating, persisting, or maintaining pace, the ALJ determined Claimant had a "moderate" limitation, noting Ms. Chaney indicated she appeared preoccupied with rapid speech, however, she appeared well oriented (Tr. at 17-18, 920). The ALJ also noted that the "record otherwise does not indicate signs of diminished attention or concentration." (Tr. at 18) Finally, with regard to adapting or managing oneself, the ALJ found Claimant had a "moderate" limitation, noting that

Ms. Chaney's report showed Claimant was tearful and somewhat agitated during the examination (Tr. at 18, 920), however, Claimant's primary care records indicated "improved emotional control with increases in medication" (Tr. at 18, 995), plus Claimant had stated she was capable of preparing her own simple meals, driving, and shopping for herself (Tr. at 18, 212-213).

Additionally, the ALJ determined that the evidence of record did not establish the presence of "paragraph C" criteria, noting that Claimant acts as her husband's caretaker, "suggesting an ability to adapt to changing demands without decompensation." (Tr. at 18, 1065)

The ALJ considered Claimant's statements in her application forms that "she has problems with understanding and needs all instructions repeated" (Tr. at 19, 209, 215), "that her mental impairments cause symptoms such as forgetfulness, nervousness, and inability to concentrate" (Tr. at 18, 238), and that she "described having problems talking to others and stated that she avoids others" (Tr. at 18, 238, 243). The ALJ also considered Claimant's testimony "that she has anxiety and depression symptoms such as panic attacks in public, poor stress tolerance, and issued with concentration and memory." (Tr. at 18)

Finally, the ALJ discussed Ms. Chaney's examination report, again noting Claimant's subjective complaints stemming from her mental impairments, her irritable and guarded behavior, her tearfulness and restricted affect, her signs of preoccupation and agitation, but demonstrating intact memory and mostly appropriate interactions. (Tr. at 21, 918, 920) The ALJ compared Ms. Chaney's observations with the record treatment notes, which generally suggested normal affect and cooperative behavior. (Tr. at 21, 1081, 1087, 1116, 1590, 1594, 1650)[6] Additionally, the ALJ

---

[6] The ALJ referred to outpatient hospital records from St. Mary's Pain Relief Center dated August 14, 2017, June 2, 2017, and July 18, 2018 and from Cabell Huntington Hospital dated April 15, 2016, June 10, 2016, and March 20, 2018.

referred to Claimant's primary care notes which "suggest greater mental stability with medication" (Tr. at 21, 572, 995).[7] Ultimately, the ALJ determined that "[o]verall, because there is an apparent history of anxiety and depression, but without clear evidence of cognitive limitation, I find these allegations somewhat supported. Therefore, I find the claimant can perform simple tasks at a non-production pace, but without frequent workplace changes." (Tr. at 21)

From this evidence, the ALJ determined that the mental RFC assessments provided by the State agency consultants, Drs. Todd and Harlow, who both opined that Claimant "can understand, remember, and carry out simple one- to three-step instructions" (Tr. at 22, 73, 89), were entitled to "significant weight" because "most portions [of their opinions] are grossly consistent with the evidence." (Tr. at 22) Significantly, the ALJ observed that while both experts did not personally evaluate Claimant, their opinions were essentially consistent with Ms. Chaney's observation that Claimant's normal memory enabled Claimant to follow short instructions. (Tr. at 22, 920)

Again, although the ALJ acknowledged Claimant's depressive disorder and anxiety disorder as severe impairments (Tr. at 15), the record of evidence did not show that these impairments caused significant functional deficits that would have precluded employment; indeed, Claimant only sought treatment for her mental health issues from her primary care providers, and their notes indicated she was stable on her medication. Accordingly, the undersigned **FINDS** the ALJ's reconciliation of Ms. Chaney's opinion with the balance of the overall record of evidence is supported by substantial evidence.

As noted *supra*, the Regulations' definition of a "medical opinion" mirrors an RFC assessment. A claimant's RFC represents the *most* that the individual can do despite her limitations

---

[7] These treatment records are dated January 6, 2016 and August 14, 2018.

or restrictions. <u>See</u> Social Security Ruling ("SSR") 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite her impairments. 20 C.F.R. § 404.1545(a). The RFC determination is an issue reserved to the Commissioner. <u>Id</u>. § 404.1527(d).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

<u>Diaz v. Chater</u>, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

Given the ALJ's discussion of the evidence with regard to Claimant's mental RFC assessment, thus limiting her to performing simple, routine tasks, but not at a production rate, and with no more than occasional changes in the work place setting (Tr. at 18), the undersigned further **FINDS** that this mental RFC assessment is also supported by the substantial evidence.

<u>Determining Severe Impairment:</u>

A "severe" impairment is one "which significantly limits your physical or mental ability to do basic work activities." <u>See</u> 20 C.F.R. § 404.1520(c). "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs." <u>Id</u>. § 404.1522(b). The Regulations provide examples of these activities:

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) capacities for seeing, hearing, and speaking;
> (3) understanding, carrying out, and remembering simple instructions;
> (4) use of judgment;
> (5) responding appropriately to supervision, co-workers and usual work situations;

and

(6) dealing with changes in a routine work setting.

Id. Contrariwise, an impairment may be considered " 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984).

Additionally, Claimant had to prove that she had an impairment (or combination of impairments) that had more than a minimal effect on her ability to do basic work activities for a continuous period of no less than 12 months. 20 C.F.R. § 404.1505(a); SSR 96-3, 1996 WL 374181. The impairment must also not "be reasonably controlled by medication or treatment[.]" See Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986). Claimant also bears the burden of establishing a disabling impairment. See Heckler v. Campbell, 461 U.S. 458, 460 (1983); Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987) (holding that the claimant bears the burden of proof and persuasion at steps one through four, stating "it is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so").

Claimant contends that at step two, "[w]ithout substantial justification", the ALJ determined Claimant's hypertension, coronary artery disease, edema, sleep disorder/sleep apnea, irritable bowel syndrome, and epicondylitis were not severe impairments, resulting in a flawed RFC assessment because it fails to include all her physical impairments. (ECF No. 13 at 6) Contrary to Claimant's argument, the ALJ provided thorough explanations for why she determined these physical impairments were not severe:

Regarding Claimant's allegations of palpations and daily chest pain, the ALJ acknowledged that the record shows a history of arrhythmia and hypertension (Tr. at 15, 272), and

23

noted her testimony that her blood pressure is generally controlled, which was corroborated by the medical records. (Tr. at 15, 504, 511, 852)[8] The ALJ also observed that "[d]octors characterized that the claimant's hypertension as essentially benign." (Tr. at 15, 1064)[9] Also, the ALJ recognized that records indicated some periods of chest pain exacerbation (Tr. at 15, 851)[10] and testing during such an episode indicated some moderate coronary artery disease (Tr. at 15, 1101)[11], however, testing "has repeatedly indicated intact wall motion and preserved ejection fraction greater than fifty-five percent" (Tr. at 15, 548, 1101)[12] The ALJ also considered that Claimant's physicians noted Claimant had chest tenderness during these periods, suggesting her symptoms were due to lupus or fibromyalgia rather than a cardiovascular disease. (Tr. at 15, 852-853)[13] The ALJ further considered Claimant's statements that in August 2018 she experienced some palpitations, but they were very brief, "lasting only a few seconds at a time." (Tr. at 15, 991)[14]

With regard to Claimant's edema, the ALJ acknowledged that records exhibited some lower extremity edema in June 2016, however, it was "trace" (Tr. at 15, 852), and that she denied edema in August 2018 (Tr. at 15, 991) and that many examinations during this period indicated no significant edema (Tr. at 15, 995, 1002, 1108)[15].

---

[8] The ALJ cited records from Claimant's treating provider, Dr. Patick, dated January 5, 2015 and June 26, 2013 as well as a consultation record from S. Mary's Medical Center dated June 7, 2016.
[9] Again, the ALJ cited a treatment note from Dr. Patick dated June 20, 2017.
[10] This record is from St. Mary's Medical Center concerning a consultation for chest pain and is dated June 7, 2016.
[11] This record is also from St. Mary's Medical Center and dated July 24, 2018.
[12] This record is from Our Lady of Bellefonte Hospital in Ashland, Kentucky dated May 8, 2015.
[13] Again, the ALJ refers to the St. Mary's Medical Center consultation report dated June 7, 2016.
[14] This record is from cardiologist, Dr. Ahmad F. El-Bash, dated August 22, 2018.
[15] These records are from Claimant's primary care provider, dated August 14, 2018, and from Dr. El-Bash dated July 18, 2018, respectively.

As for Claimant's "sleep disorder" or "sleep apnea", the ALJ noted the treatment notes indicated such diagnoses (Tr. at 15, 401, 1005)[16], however, "there is little evidence that these diagnoses are supported by objective medical evidence." In support of this conclusion, the ALJ further noted that two separate sleep studies from June 2012 and August 2017 showed minimal evidence of a breathing-related sleep problem, with the latter study "showing only one such event an hour and continuous oxygen saturation of greater than ninety percent." (Tr. at 15, 272, 1127) The ALJ also acknowledged that Claimant testified that her sleep problems are caused by muscle tension from her fibromyalgia rather than a specific breathing problem. (Tr. at 15)

Regarding Claimant's testimony that she has inflammation of her bowels and that they would "lock up" without medication, the ALJ acknowledged the record indicates some history of constipation "often attributed to irritable bowel syndrome (IBS)." (Tr. at 15, 499)[17] The ALJ also noted a "colonoscopy in February 2018 indicated some chronic inflammation consistent with her testimony." (Tr. at 15, 1035) However, the ALJ also noted that for much of the relevant period, Claimant's primary care records indicated "her IBS was 'not an issue' " (Tr. at 15, 499, 502) and that Claimant described her abdominal pain and bloating as generally mild in February 2018 (Tr. at 15, 1036).[18] The ALJ also noted that examination showed minimal or mild abdominal tenderness during this period. (Tr. at 15, 866, 1047)[19] The ALJ also considered Claimant's testimony that she sometimes does not take her IBS medication when she leaves her home due to diarrhea, and that

---

[16] Though the ALJ cited Exhibit "1F/129", this is possibly a scrivener's error, as Exhibit 2F/129 indicates a diagnosis of "sleep disorder" from Dr. Feinberg dated May 13, 2013; the other record concerns a return visit note from Dr. Patick indicating a diagnosis of "obstructive sleep apnea (adult) (pediatric)" and is dated June 18, 2018.
[17] This refers to a treatment note from Dr. Patick dated January 6, 2016.
[18] These concern treatment records dated January 6, 2016, July 6, 2015 and February 2, 2018, respectively.
[19] These records are dated June 7, 2016 and January 11, 2018.

there was evidence of occasional explosive stools with that medication, Claimant also indicated that she was generally doing well with it. (Tr. at 15-16, 995)[20]

Finally, with regard to Claimant's epicondylitis, the ALJ acknowledged there was a history "preceding the alleged onset date including observations of elbow tenderness in July 2012" (Tr. at 16, 757), however, subsequent records did not suggest inflammation of the epicondyle and rheumatology records generally indicate stable or normal range of motion without effusion or synovitis. (Tr. at 16, 290, 303, 328, 942, 946, 950)[21] The ALJ also noted that at the hearing, Claimant did not testify about specific elbow problems to suggest the condition remained severe. (Tr. at 16)

In sum, it is clear that the ALJ's second step findings were supported by substantial evidence, and not merely "without substantial justification", accordingly, Claimant's argument to that extent lacks merit.

<u>Evaluation of Symptoms in Disability Claims:</u>

Claimant conclusively asserts that the ALJ's credibility analysis of her symptoms was in error because "[i]t is more reasonable to conclude that the [Claimant's] physical and mental impairments prevent her from engaging in any substantial gainful activity and certainly not work at the light exertional level." (ECF No. 13 at 6)

SSR 16-3p[22] clarifies the evaluation of symptoms, including pain: 20 C.F.R. § 404.1529 requires a finding of the extent to which an individual's statements about pain or other symptom(s)

---

[20] This is a primary care provider record dated August 14, 2018.

[21] The ALJ referred to records from Dr. Feinberg with the Ashland Arthritis Center dated January 18, 2016, July 22, 2015, August 4, 2014 and rheumatology records dated July 22, 2015.

[22] Effective March 28, 2016, SSR 16-3p superseded SSR 96-7p and therefore governed the ALJ's decision herein. <u>See</u>, SSR 16-3p, 2016 WL 1131509. The new Ruling eliminates the use of the term "credibility" from SSA policy because the Regulations do not use that term: "we clarify that subjective symptom evaluation is not an examination

and its functional effects can reasonably be accepted as consistent with the objective medical evidence and other evidence; that explains the factors to be considered in assessing the consistency of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the consistency of the individual's statements.

The Ruling further directs that adjudicators use a two-step process for evaluating an individual's symptoms: first, it must be determined that the individual has a medically determinable impairment ("MDI") that could reasonably be expected to produce the individual's alleged symptoms; and second, the intensity and persistence of the individual's symptoms must be evaluated to the extent which they limit the individual's ability to perform work-related activities. See, SSR 16-3p, 2016 WL 1119029, at *3-4. This evaluation must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. § 404.1529(c)(4). Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by

---

of an individual's character. Instead, we will more closely follow our regulatory language regarding symptom evaluation." See, 2016 WL 1119029, at *1.

your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons . . . Factors relevant to your symptoms, such as pain, which we will consider include:

(i) Your daily activities;

(ii) The location, duration, frequency, and intensity of your pain or other symptoms.

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

Id. § 404.1529(c)(3).

Moreover, it is well known that credibility determinations are properly within the province of the adjudicator and beyond the scope of judicial review. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Davis v. Colvin, 3:13-CV-23399, 2015 WL 5686896, at *7 (S.D.W. Va. Sept. 8, 2015) ("The credibility determinations of an administrative judge are virtually unreviewable on appeal.")

The ALJ noted that Claimant alleged disability due to lupus, Sjogren's syndrome, fibromyalgia, osteoarthritis, degenerative disc disease, asthma, depression, and anxiety. (Tr. at 19) The ALJ then noted Claimant's allegations in her application forms from May 2016: that she had continuous chest, shoulder, and back pain that caused her to lie down all day; that she had problems sitting and standing for long periods without pain or numbness; that she has constant fatigue and muscle weakness; that she gets painful skin rashes while outside; that she has shortness of breath while walking; and that she had problems with understanding and needed all instructions repeated. (Tr. at 19, 204-205, 209, 215) Next, the ALJ noted her allegations in application forms submitted

in December 2016: that she continued to have constant pain and fatigue as well as joint swelling with any activity; that she experienced forgetfulness, nervousness, and inability to concentrate; and that she had problems talking to others and avoids others. (Tr. at 19, 238, 243) The ALJ then considered Claimant's testimony from the hearing: that her lupus got progressively worse, with chronic joint impairment in her hips and knees; that she experienced "electric" feelings in the skin when exposed to the sun; that she had numbness in her lower arms and right leg and pain from a prior spinal surgery; that she had anxiety and depression symptoms such as panic attacks in public, poor stress tolerance, and issues with concentration and memory. (Tr. at 19)

The ALJ also considered Claimant's statements concerning her functionality: in May 2016 she estimated she could lift ten to fifteen pounds, walk thirty feet before resting for five to ten minutes, and sustain attention for less than five minutes. (Tr. at 19, 215) In December 2016, the ALJ noted that Claimant estimated she can walk for fifty feet before resting for five to ten minutes and can sustain attention for no more than a few minutes. (Tr. at 19, 243) At the hearing, the ALJ noted that Claimant testified that she can walk half a block to a block. (Tr. at 19)

The ALJ then compared Claimant's allegations with the medical evidence of record, beginning with her lupus diagnosis. (Tr. at 20) The ALJ observed this diagnosis was approximately twenty years prior to the alleged onset date, but since then, Claimant experienced fibromyalgia symptoms, with a widespread distribution of joint and muscle pain and a series of tender points. (Tr. at 20, 365, 942, 946) The ALJ acknowledged that medical records confirmed a diagnosis of generalized osteoarthritis in August 2017, as well as intermittent oral ulcers and rashes, including reports of chronic fatigue that Claimant described "as 'horrible' at times." (Tr. at 20, 929, 940) The ALJ noted clinical findings were "somewhat consistent with these allegations, including some

faint photosensitivity rashes of photosensitive rashes." (Tr. at 20, 278) Medical records documented mild knee crepitus in June 2018 and shoulder stiffness in March 2018 (Tr. at 20, 942, 953), however, the ALJ noted that "most rheumatology evaluations indicate no synovitis, loss of range of motion, or swelling in the joints" (Tr. at 20, 278, 322, 365, 401, 942, 946). The ALJ further noted that evaluations of Claimant's gait have been normal and she did not rely on an assistive device (Tr. at 20, 942, 946, 950, 1087, 1590, 1592), which are "inconsistent with allegations that the claimant can wa[lk] no more than a few feet before stopping due to pain." Despite Claimant's repeated complaints of chronic fatigue, the ALJ noted she did not report any significant functional issues related to it. (Tr. at 20, 277, 297, 927) The ALJ finally noted that medical records indicated Claimant "achieved 'reasonable control' of her lupus in June 2017, suggesting less severe and pervasive symptoms than the claimant alleges." (Tr. at 20, 1064)

From this medical evidence, the ALJ determined that although Claimant has a history of chronic tenderness and fatigue from lupus, the record neither indicated she had limited motion or antalgic gait, nor extensive limitations from her conditions. (Tr. at 20) Nevertheless, the ALJ did find that Claimant's "pain and propensity towards rashes preclude work around temperature extremes." (Id.)

With respect to Claimant's history of back pain with prior laminectomy in 2009 (Tr. at 20, 1079), the ALJ recognized that treatment records since then indicated some recurrence of back pain. (Tr. at 20, 944, 946-947) However, the ALJ also noted that treatment notes showed Claimant had a stable functional range of motion of the lumbar spine (Tr. at 20, 290, 297, 322, 1470), straight leg raise testing has been negative (Tr. at 20, 942, 953, 963), and while there were times of some weakness, records suggested this was due to deconditioning rather than true neurological muscle

weakness. (Tr. at 20, 291) Finally, the ALJ noted that medical records show Claimant demonstrated intact sensation which is "inconsistent with allegations of numbness." (Tr. at 20, 956, 1116) The ALJ also expressly considered Claimant's obesity along with her rheumatologic conditions and prior spinal surgery and concluded that she cannot climb ladders, ropes, or scaffolds and limited her to occasional kneeling, crouching, and crawling, but noted Claimant had sufficient spinal mobility to stoop frequently. (Tr. at 20) Because of her history of prior spinal surgery, the ALJ further restricted Claimant from more than occasional exposure to vibrations. (Id.)

The ALJ then proceeded to discuss the medical record concerning Claimant's asthma, first noting that breathing testing prior to the alleged onset date indicated moderate restrictive defects (Tr. at 20, 261-262), however, during most of the relevant period, her asthma remained generally stable, even described at times by Claimant's primary care physician as "not an issue" (Tr. at 20, 499).[23] The ALJ acknowledged the record suggested some worsening of this condition in March 2018, with chest imaging indicating some small chest nodules (Tr. at 21, 1018-1019), and Claimant exhibited bilateral decreases in breath sounds and expiratory wheezing (Tr. at 21, 1030-1031), however, records from August 2018 indicated Claimant's symptoms had improved with medication with no wheezing (Tr. at 21, 993, 1020). Ultimately, the ALJ found that the overall evidence only provided partial support for Claimant's allegations, but nevertheless determined that "[s]he can have no concentrated exposure to respiratory irritants, but retains sufficient lung function, strength, and mobility to perform light exertion." (Tr. at 21)

---

[23] This record is from Dr. Patick and dated January 6, 2016. Although the ALJ noted that "[t]he claimant also had one hundred percent oxygen saturation in August 2018 (Exhibit 6F/20)", this treatment note is actually dated June 7, 2016 (Tr. at 866).

Following her discussion of the medical evidence, the ALJ then discussed the other evidence of record in her analysis under SSR 16-3p. (Id.) The ALJ observed that the "record is unclear as to the reasons that the claimant had stopped working", noting she stated she quit work because she lost her job due to conflicts with coworkers (Tr. at 21, 244) but medical records also indicated she stopped working because she disliked the night shift and that she left her job to take care of her husband (Tr. at 21, 511, 498, 510, 1065).

The ALJ noted that Claimant treated her impairments with a series of infusions (Tr. at 21, 1132-1225), but she was also prescribed aquatherapy for her fibromyalgia, "suggesting that she could perform some exercise" (Tr. at 21, 1087), and treatment notes showed she did some exercise for her fibromyalgia treatment (Tr. at 21, 929).

Additionally, the ALJ considered Claimant's side effects from her medications, noting that she testified that some of them caused "drowsiness and foggy thinking", but also noting that she "stated her foggy thinking occurs when she takes 'extra' anxiety medication, suggesting that these side effects do not occur with regular doses." (Tr. at 21)

With respect to Claimant's activities of daily living, the ALJ found that the record "also contains inconsistent descriptions of activities of daily living", as she described having difficulty showering and performing minimal home chores at the hearing, but in her May 2016 applications forms, she admitted performing light cleaning, laundry, driving a car, shopping, and managing her own finances. (Tr. at 21-22, 212-213) Again, the ALJ note that Claimant told her treatment providers that she was acting as her husband's caretaker (Tr. at 22, 498), but "she testified that she only performs simple tasks such as bringing him water." (Tr. a 22)

The ALJ also looked at the opinion evidence, noting that State agency medical consultant Dr. Rabah Boukhemis determined Claimant could perform light work with postural limitations was consistent with the evidence, despite the fact he did not examine Claimant. (Tr. at 22, 70-72)

As discussed in greater detail *supra*, the ALJ reviewed the medical and other evidence of record concerning Claimant's mental impairments, and determined that her allegations of disabling symptoms as they related to her depression and anxiety were not fully supported by the record.

In sum, the ALJ thoroughly considered the medical and other evidence of record and provided a reasonable explanation for why she found Claimant's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely consistent with the record that complies with SSR 16-3p and the Regulations. Accordingly, the undersigned **FINDS** the ALJ's evaluation of Claimant's symptoms is supported by substantial evidence.

The Physical RFC Assessment:

At step three, the ALJ specifically found that none of Claimant's severe impairments meet Listings requirements. (Tr. at 16) Although Claimant contends both her mental and physical impairments preclude all work, as discussed *supra*, the ALJ provided a thorough explanation for why she found not only were Claimant's physical (and mental) impairments not entirely disabling, but also that they did not prevent her from performing light work:

> In sum, the above residual functional capacity assessment is supported by pulmonary function testing (Exhibit 1F/4-5); Exhibit 11F/43), primary care records (Exhibits 3F, 11F), rheumatology and pain management records (Exhibits 2F, 9F, 10F, 12F), and [Ms.] Chaney's examination (Exhibit 8F).

(Tr. at 22, 261-262, 1031, 483-529, 989-1075, 273-482, 923-939, 940-988, 1076-1099, 917-922)

Though "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision" Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (quoting

Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (*per curiam*)), it is necessary that an ALJ " 'must build an accurate and logical bridge from the evidence to his conclusion.' " Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)). In this case, the ALJ provided more than sufficient notations from the record that documented Claimant's complaints of her various symptomatology, and compared these with the overall evidence before her. Although Claimant advocates for an alternate decision, such are matters that involve resolving the conflicting evidence of record, which is an evidentiary finding within the purview of the ALJ. In short, though Claimant may disagree with the ALJ's determination that she can work at light exertional levels for an eight-hour workday, this Court cannot re-weigh this conflicting evidence or substitute its judgment for the Commissioner's. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); see also, SSR 96-8p, 1996 WL 3741784, at *7.

In short, the ALJ's narrative of the "collective record" that included objective evidence, imaging, examination findings as well as Claimant's own statements and testimony, and her determination that Claimant remained capable of light work despite her ongoing complaints, provided sufficient explanation allowing for meaningful judicial review. Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015). This Court is not "left to guess about how the ALJ arrived at his conclusions" therefore remand is not necessary. Mascio, 780 F.3d at 637.

In sum, the undersigned **FINDS** the RFC assessment with respect to Claimant's physical impairments is supported by substantial evidence.

Fifth Step Finding:

Finally, with respect to Claimant's assertion that the ALJ "should have accepted the testimony of the Vocational Expert who testified that the [Claimant] cannot engage in any

34

substantial gainful activity if she is off-task 15% to 20% or more of the normal workday and/or misses more than 1 day per month from work" (ECF No. 13 at 6), this Circuit has long since held that hypothetical questions need only incorporate those limitations that an ALJ accepts as credible and that are supported by the record. See Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). As stated above, the reconciliation of conflicting evidence was for the ALJ to resolve, not this Court. See SSR 96-8p, 1996 WL 3741784, at *7. Accordingly, the undersigned **FINDS** that the vocational expert's responses to the ALJ's controlling hypothetical question were supported by substantial evidence, and further **FINDS** that the ALJ was entitled to rely upon those responses at the fifth step of the sequential evaluation process. See 20 C.F.R. §§ 404.1560(c)(2), 404.1566(e).

Finally, the undersigned **FINDS** that the Commissioner's final decision determining that Claimant is not disabled is supported by substantial evidence.

## **Recommendations for Disposition**

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for remand (ECF No. 13), **GRANT** the Defendant's request to affirm the decision below (ECF No. 16), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings

and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: May 28, 2020.



Omar J. Aboulhosn
United States Magistrate Judge